**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 3, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JOHN DOE,

    Defendant - Appellant.

No. 26-9900

_____

Before **PHILLIPS**, **KELLY**, and **MORITZ**, Circuit Judges.
_____

**MORITZ**, Circuit Judge.
_____

John Doe appeals the denial of his motion to dismiss an information charging him with juvenile delinquency for violating 18 U.S.C. § 922(x)(2), which prohibits juvenile possession of a handgun. Doe argues that § 922(x)(2) exceeds Congress's power under the Commerce Clause. We hold that Congress had a rational basis to conclude that regulating juvenile handgun possession is an essential part of a comprehensive regulatory scheme outlined in § 922(x) that directly and substantially affects interstate commerce. Congress also had a rational basis to conclude that this regulatory scheme would be undercut if § 922(x)(2) were excised from the statute. We therefore affirm the district court's ruling that Congress possessed the authority to enact § 922(x)(2).

**Background**

Congress enacted § 922(x) as part of the Violent Crime Control and Law Enforcement Act of 1994 (the 1994 Act). *See* Pub. L. No. 103-322, § 110201, 108 Stat. 1796, 2010–11 (1994). The statute has three primary subparts. Section 922(x)(1) makes it unlawful for a person to "sell, deliver, or otherwise transfer" a handgun or handgun ammunition "to a person who the transferor knows or has reasonable cause to believe is a juvenile." Section 922(x)(2) makes it unlawful for a juvenile to "knowingly possess" a handgun or handgun ammunition. And § 922(x)(3) outlines a series of detailed exceptions to subsections (x)(1) and (x)(2).[1]

By juvenile information, the government charged John Doe with two counts of violating the Federal Juvenile Delinquency Act, 18 U.S.C. §§ 5031–5043, in that he possessed a handgun in violation of § 922(x)(2) on two separate occasions. Doe moved to dismiss the information, arguing that § 922(x)(2)'s prohibition on juvenile handgun possession violates the Second Amendment and exceeds Congress's Commerce Clause authority. The district court denied the motion. Doe admitted delinquency to count one of the information. The district court then sentenced him to juvenile probation until his 21st birthday.

Doe appeals the district court's Commerce Clause ruling, raising a facial challenge to § 922(x)(2). But he doesn't challenge the district court's holding as to

---

[1] Section 922(x)(5) defines "juvenile" as "a person who is less than 18 years of age."

2

the Second Amendment, so we need only resolve whether Congress had the power to enact § 922(x)(2) under the Commerce Clause. *See United States v. Haney*, 264 F.3d 1161, 1166 (10th Cir. 2001).

## Analysis

We review the constitutionality of a statute de novo. *United States v. Patton*, 451 F.3d 615, 620 (10th Cir. 2006). We "must 'presume that the statute is constitutional.'" *United States v. Brune*, 767 F.3d 1009, 1015 (10th Cir. 2014) (quoting *United States v. Carel*, 668 F.3d 1211, 1216 (10th Cir. 2011)). "That deference requires 'a plain showing that Congress has exceeded its constitutional bounds.'" *Id.* (quoting *United States v. Morrison*, 529 U.S. 598, 607 (2000)). We begin with the Commerce Clause itself and the case law that guides our decision. We then turn to the regulatory scheme in § 922(x) before addressing Doe's arguments.

The Commerce Clause grants Congress the power "[t]o regulate [c]ommerce with foreign [n]ations, and among the several [s]tates, and with the Indian [t]ribes." U.S. Const. art. I, § 8, cl. 3. This case deals only with Congress's power to regulate "[c]ommerce . . . among the several [s]tates"—what is known as the Interstate Commerce Clause. Under that clause, a statute is within Congress's power when Congress has "a rational basis . . . for concluding that a regulated activity sufficiently [affects] interstate commerce." *United States v. Lopez*, 514 U.S. 549, 557 (1995); *see also Gonzales v. Raich*, 545 U.S. 1, 22 (2005).

"Consistent with" that principle, the Supreme Court has outlined three categories of activity Congress possesses the power to regulate: "the use of the

3

channels of interstate commerce," "the instrumentalities of interstate commerce, or persons or things in interstate commerce," and "those activities having a substantial relation to interstate commerce." *Lopez*, 514 U.S. at 558–59. Only the third category is at issue here.[2] Congress's power to regulate "activities having a substantial relation to interstate commerce" is relatively broad. In effect, it encompasses two powers: one, the power to regulate intrastate activities that in the aggregate substantially affect commerce, and two, the "authority to regulate intrastate conduct when failing to do so would 'substantially undercut' Congress'[s] attempt to regulate the relevant interstate market." *United States v. Humphrey*, 845 F.3d 1320, 1324 (10th Cir. 2017) (quoting *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 561 (2012)).

To determine whether an activity has a "substantial relation to interstate commerce," the Supreme Court focuses on several factors, including whether the activity is economic or commercial in nature; whether there is a jurisdictional element in the statute cabining its reach to interstate commerce; any congressional findings illuminating whether an activity substantially affects interstate commerce; and the attenuation of the link between the activity and interstate commerce. *See Morrison*, 529 U.S. at 610–12; *Patton*, 451 F.3d at 623. We consider the factors holistically. *See United States v. Durham*, 902 F.3d 1180, 1215 n.23 (10th Cir. 2018).

---

[2] We pause to note that *Haney* held that "machineguns are inherently 'things in interstate commerce' and therefore may be regulated under the second *Lopez* category." 264 F.3d at 1167. Because neither party suggests that handguns are "inherently" things in interstate commerce, we do not address here whether Congress may regulate possession of them under the second *Lopez* category.

To that end, congressional findings "are neither necessary nor determinative." *Id.* at 1198. Nor would the presence of a jurisdictional element limiting the statute's reach necessarily "ward[] off constitutional challenges." *Patton*, 451 F.3d at 632.

We are also guided by the analyses in *Lopez*, *Morrison*, and *Raich*. In *Lopez*, the Court held that 18 U.S.C. § 922(q), which prohibited knowing possession of a firearm in a school zone, was not a regulation of a "commercial activity nor [contained] a requirement that the possession be connected in any way to interstate commerce." 514 U.S. at 551. In *Morrison*, the Court held that the causal chain between gender-motivated violence and interstate commerce was significantly attenuated, reasoning that if Congress can criminalize intrastate gender-motivated violence simply because the aggregate "impact of that crime has substantial effects on employment, production, transit, or consumption," then there would be practically no limit to Congress's Commerce Clause power. 529 U.S. at 615. Accordingly, it held that Congress may not "regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.* at 617. And in *Raich*, the Court held that even where an intrastate activity is not "commercial," Congress may regulate it "if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Raich*, 545 U.S. at 18; *see also People for Ethical Treatment of Prop. Owners v. U.S. Fish & Wildlife Serv.* (*PETPO*), 852 F.3d 990, 1007 (10th Cir. 2017) (rejecting Commerce Clause challenge because "piecemeal excision of purely intrastate species would severely undercut the [regulatory scheme's] conservation purposes").

5

*Raich* and *Lopez* thus provide examples of permissible and impermissible regulations on noncommercial intrastate activity. In *Raich*, the Court determined that prohibiting homegrown marijuana possessed for personal use was an essential part of a larger regulatory scheme aimed at curtailing the illicit interstate marijuana market; without the prohibition, that permissible goal would be frustrated as "high demand" could draw homegrown "marijuana into [the interstate] market." 545 U.S. at 19. By contrast, in *Lopez*, the Court noted that § 922(q) was not "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." 514 U.S. at 561. There was simply no reason to believe that Congress, through § 922(q), aimed to regulate an interstate market in guns to be possessed and used in school zones or that such a niche market in fact existed.

Our case law further illuminates the contrast between cases like *Raich* and cases like *Lopez*. In *Haney*, we held that the ban on possession of post-1986 machineguns in § 922(o) was "an essential part of the federal scheme to regulate interstate commerce in dangerous weapons." 264 F.3d at 1168. We recognized that Congress prohibited the transfer of post-1986 machineguns in commerce without federal approval of the transfer, *id.* at 1168–69, and that the possession ban went "hand in hand" with the transfer ban, *id.* at 1170. But in *Patton* we held that the "prohibition on possession of body armor by felons" in 18 U.S.C. § 931 was "unrelated to any broader attempt to suppress the market . . . or to comprehensively control supply," and, therefore, that it was not an essential part of a permissible

regulatory scheme. 451 F.3d at 627. We noted that unlike the statute at issue in *Raich*, Congress did not restrict the manufacture, distribution, sale, possession, or use of body armor, outside of barring possession by felons. *Id.*

Guided by this precedential background, we turn to case law regarding § 922(x). Two circuits have upheld § 922(x) as a scheme that regulates interstate commerce. In *United States v. Michael R.*, the Ninth Circuit concluded that § 922(x) concerns the sale, delivery, or transfer of firearms to a juvenile and thus regulates "interstate commerce by attacking both the supply and demand for firearms with respect to juveniles." 90 F.3d 340, 344 (9th Cir. 1996). It further concluded that § 922(x)(2) is an "essential part" of that regulatory scheme because it "restricts demand" for handguns. *Id.* The First Circuit endorsed those conclusions the following year. *See United States v. Cardoza*, 129 F.3d 6, 12–13 (1st Cir. 1997). And then, after *Morrison* and *Raich*, the First Circuit reaffirmed those conclusions. *United States v. Rene E.*, 583 F.3d 8, 18 (1st Cir. 2009) ("[N]othing in *Morrison* or *Raich* undermines our analysis of [§] 922(x)(2) in *Cardoza*.").

We join the First and Ninth Circuits in concluding that § 922(x)(2) is an essential part of a regulatory scheme outlined in § 922(x) that directly and substantially regulates interstate handgun markets by excluding juveniles from them—a permissible regulatory end. In other words, § 922(x)(2) is more like the regulations at issue in *Raich* and *Haney* than those at issue in *Lopez* or *Patton*.

As an overarching analytical matter, § 922(x)(2) can't be viewed in isolation from the rest of § 922(x). Congress enacted all subsections of § 922(x) at once in the

same subtitle of the 1994 Act. *See* 108 Stat. at 2010–11. And neither the 1994 Act nor any of the subsections of § 922(x) contain severability language indicating that Congress intended each subsection to be considered in isolation. Viewed as inseparable parts of Congress's scheme, the subsections of § 922(x) work together. Section 922(x)(1) prohibits the sale, delivery, and transfer to juveniles of handguns or handgun ammunition, and § 922(x)(2) makes it unlawful for juveniles to possess handguns, subject to several exceptions in subsection (x)(3).

Turning to the factors outlined in *Morrison*, § 922(x)(2), standing on its own, does not regulate strictly economic or commercial activity because it prohibits mere possession of a good, not the buying, selling, preparation, or transportation of that good, or similar market-adjacent activity. *See Lopez*, 514 U.S. at 567 ("The possession of a gun in a local school zone is in no sense an economic activity . . . ."); *Patton*, 451 F.3d at 625 (concluding that mere possession of body armor by a felon was not commercial or economic activity). And we acknowledge that § 922(x)(2) lacks an express jurisdictional element.[3]

But turning to Congress's purpose, § 922(x)(2) is part of a permissible regulatory scheme. Section 922(x) is directed at "stopping the commerce in handguns with juveniles nationwide." H.R. Rep. No. 103-711, at 391 (1994) (Conf. Rep.),

---

[3] Section 922(x)(2) doesn't include an explicit interstate element as part of the offense, nor does federal law define "handgun" to include only those handguns that have previously moved in interstate or foreign commerce, *see* 18 U.S.C. § 921(a)(3), (30).

*as reprinted in* 1994 U.S.C.C.A.N. 1839, 1858–59.[4] Restated, Congress's goal in § 922(x) is to exclude juveniles from interstate handgun markets. This goal is within Congress's Commerce Clause power, which extends to excluding buyers from interstate or foreign markets. *See Durham*, 902 F.3d at 1193 (holding that it is permissible to exclude U.S. citizens and permanent residents from international sex-trafficking markets under the Foreign Commerce Clause). That's because reducing the number of buyers is likely to substantially affect the size of interstate markets in the relevant good as well as the interstate market price for that good, or so Congress could rationally conclude. *Cf. PETPO*, 852 F.3d at 1006 (holding that Congress could rationally conclude that Endangered Species Act substantially affects interstate commerce because it's a "brake on economic activity").

Finally, turning to the link between the regulation and interstate commerce in light of *Raich*, Congress could further rationally conclude that without § 922(x)(2), the permissible goal evinced in subsection (x)(1)—excluding juveniles from interstate handgun markets—would be undercut. As in *Haney*, "the possessory component" of the statute "goes 'hand in hand' with the prohibition on transfers." 264 F.3d at 1170; *cf. PETPO*, 852 F.3d at 1002 (concluding that statute's prohibition on the "take" of one species had to be analyzed within overall regulatory framework

---

[4] To be sure, *Morrison* precludes reliance on at least some of the congressional findings underpinning the 1994 Act to the extent they indicate an indirect effect on interstate commerce through the economic friction created by juvenile handgun crime. *See, e.g.*, H.R. Rep. No. 103-711, at 390–91 (Conf. Rep.).

pertaining to regulated species writ large). Stated differently, if juveniles could unconditionally possess handguns, rather than possess them only in the narrow circumstances outlined in § 922(x)(3), it's rational to believe juveniles would be able to participate in interstate handgun markets to a markedly greater degree. Without subsection (x)(2), it's further rational to believe there would be an increase in juvenile handgun buyers compared to the status quo because it would be harder to police juvenile buyers who could unconditionally possess handguns. Moreover, Congress could rationally conclude that eliminating the prohibition in subsection (x)(2) would enable juveniles to participate in handgun markets as sellers to a greater extent than in the status quo for a similar reason. These inferences parallel those sanctioned in *Raich*: if the range of permissible intrastate marijuana possession was broader, then Congress's regulatory scheme would be undercut because it would be harder to exclude homegrown marijuana from the interstate market. 545 U.S. at 19.

The contrast with *Patton* further illuminates why § 922(x)(2) is within Congress's Commerce Clause power. In *Patton*, Congress criminalized a small range of conduct, leaving many legal pathways for felons to participate in body-armor markets. 451 F.3d at 627. Section 931 permitted the purchase, ownership, and possession of body armor by felons, provided that the felon had "written certification" from an employer that the body-armor purchase, ownership, or possession was necessary for a "lawful business activity," and the use or possession was "limited to the course" of performing it. § 931(a), (b)(1). "No one violate[d] the law by selling to a felon or buying from a felon, and felons themselves [could] sell

10

body armor previously acquired or use it in the course of their licit occupations."
*Patton*, 451 F.3d at 627. These exceptions suggested that Congress had no serious intention of regulating or curtailing an overarching market for body armor generally, or the supply and demand of body armor for felons specifically. *Id.* (further noting that defendant's purchase was lawful).

Not so here. There are almost no avenues for juveniles to participate in handgun markets. Section 922(x)(1) demonstrates as much, as does 18 U.S.C. § 922(b)(1), which makes it unlawful for a federally licensed firearms dealer to "sell or deliver . . . any firearm or ammunition to any individual" reasonably believed to be under 18. True, a "temporary transfer" of a handgun to a juvenile by an individual who is not a federally licensed firearms dealer and "possession" by a juvenile are permissible in certain circumstances. *See* § 922(b)(1), (x)(3)(A)–(D). But none of the exceptions in subsection (x)(3) permit either a *sale*, or *permanent transfer* of ownership or possession, of a handgun to a minor. Instead, each exception is cabined to circumscribed instances of temporary possession, use, or exigent circumstances. Individuals and businesses can't sell handguns to juveniles, regardless of the juvenile's purpose in obtaining a handgun; juveniles can't own handguns, regardless of the purpose of their ownership; and, by necessary implication, juveniles can't sell handguns that they can't temporarily possess. In short, juveniles are excluded from market participation in the vast majority of conceivable situations as part of a

11

comprehensive regulatory scheme in § 922(x).[5] Congress could rationally conclude that scheme would be undercut if juveniles were permitted to possess handguns for any reason.

Doe resists that conclusion for several reasons. First, analogizing to *Lopez* and *Morrison*, he argues that juvenile handgun possession is noneconomic activity that is "simply too attenuated to have a significant effect on interstate commerce," even in the aggregate. Aplt. Br. 33. Second, Doe argues that permitting § 922(x)(2)'s regulation of noneconomic, intrastate activity would give Congress "a general police power." Rep. Br. 24. Next, Doe argues that the possession of handguns isn't completely banned and so there is no overarching regulatory scheme related to handguns. And finally, he argues that *Michael R.* and *Cardoza* are not persuasive because they were decided before the Supreme Court decided *Morrison*.

Doe's arguments possess several flaws. His first argument addresses only one aspect of Congress's power under the third *Lopez* category, whether intrastate juvenile

---

[5] The highly detailed, multitiered nature of the exceptions tends to bolster, rather than undercut, the comprehensiveness of the federal scheme in § 922(x). For example, the scheme permits temporary transfers of handguns "possessed and used by the juvenile . . . in the course of employment[,] . . . ranching or farming[,] . . . target practice, hunting, or a course of instruction" on safe handgun use, "with the prior written consent of the juvenile's parent or guardian" who is not prohibited from possessing a firearm, provided the juvenile has the written consent in their possession "at all times" and the temporary transfer or possession is in "accordance with [s]tate and local law." § 922(x)(3)(A)(i)–(iv). Likewise, juveniles who are members of the military may possess handguns "in the line of duty," juveniles may inherit title—though not possession—of handguns, and may possess handguns "in defense" of themselves or others "against an intruder" in their residence or a residence in which they are "an invited guest." § 922(x)(3)(B)–(D).

handgun possession is an activity that in the aggregate substantially affects commerce, without addressing whether permitting juvenile possession would undercut the permissible regulatory scheme in § 922(x). *See Patton*, 451 F.3d at 626 (describing the two ways noncommercial activity may have a substantial effect on interstate commerce). Further, *Raich* forecloses the argument that legislation aimed at interstate commerce through noncommercial, noneconomic intrastate possession is necessarily impermissible. *See* 545 U.S. at 37 (Scalia, J., concurring) ("Congress may regulate even noneconomic local activity if that regulation is a necessary part of a more general regulation of interstate commerce.").

Doe's second argument is similarly unpersuasive. Upholding § 922(x)(2) would not give Congress a general police power because Congress still faces considerable limits in light of the analysis above. For example, if Congress had not outlawed handgun sales to juveniles or if Congress left open legal pathways for juveniles to participate in interstate handgun markets, subsection (x)(2) might be constitutionally suspect. Thus, as the majority implicitly did in *Raich*, we reject the argument that our disposition provides Congress with unbridled police power. *See id.* at 45 (O'Connor, J., dissenting) (arguing that majority opinion provided Congress with "a general police power of the sort retained by the [s]tates" (quoting *Lopez*, 514 U.S. at 567)).

Doe's third argument—that the absence of a complete ban on handgun possession means there is no overarching regulatory scheme—also fails to persuade us. As noted, minors may possess handguns in a variety of circumstances. *See* § 922(x)(3). And adults can purchase and possess handguns in an even wider variety of circumstances. But

13

neither the Supreme Court nor we have ever held that a total ban on the possession of an item is a prerequisite to finding the existence of a general regulatory scheme. To the contrary, in *Haney*, we recognized the existence of a general regulatory scheme involving machineguns, even though § 922(o) only prohibited transfer or possession of a machinegun that was not lawfully possessed before May 19, 1986. 264 F.3d at 1168–69. Moreover, for the reasons outlined above, § 922(x) *is* tantamount to a total ban on juvenile participation in handgun markets.

Finally, regarding Doe's argument that *Michael R.* and *Cardoza* are not persuasive because they were decided before *Morrison,* we note that we have reiterated post-*Morrison* that "the Commerce Clause authorizes regulation of noncommercial, purely intrastate activity that is an essential part of a broader regulatory scheme" regulating interstate commerce. *PETPO*, 852 F.3d at 1002. So we agree with the First Circuit, which rejected this same argument by pointing out that both *Morrison* and *Raich* "reaffirmed Congress's power to regulate intrastate economic activity that substantially affects interstate commerce" where there is a scheme designed to regulate an interstate market and a component regulation targeting intrastate conduct is an essential part of that larger scheme. *Rene E.*, 583 F.3d at 18.

### Conclusion

We affirm the district court's ruling that Congress possessed the authority to enact § 922(x)(2) under the Commerce Clause. Regulating juvenile handgun possession is an essential part of a comprehensive regulatory scheme outlined in

§ 922(x) that substantially affects interstate commerce. Further, Congress could rationally conclude that scheme would be undercut if subsection (x)(2) were excised from the statute.